IOWA-DES MOINES NATIONAL BANK, trustee, appellee, v. FORT DODGE, DES MOINES AND SOUTHERN RAILWAY COMPANY, appellant, GEORGE W. McGHIE et al., intervenors-appellees.

No. 49366.

(Reported in 89 N.W.2d 360)

APRIL 9, 1958.

Bannister, Carpenter, Ahlers & Cooney, of Des Moines, for appellant.

Gibson, Stewart & Garrett, of Des Moines, for appellee.

Parrish, Guthrie, Colflesh & O'Brien, of Des Moines, for intervenors-appellees.

WENNERSTRUM, J.—Plaintiff, as trustee under a mortgage securing income bonds issued by the Fort Dodge, Des Moines and Southern Railway Company, brought an action for a declaratory judgment to determine what part, if any, of the income earned

during the year 1955 was available for the payment of the interest on the bonds. The railroad company, the defendant, had determined there was not sufficient net income during the year in question to pay any interest. The company, through its board of directors, and operating management asserted certain amounts should be first deducted to maintain each of five funds provided for under the terms of the mortgage. The intervenors, representing the bondholders, contend no deductions should be made from the net income shown by the annual report except a comparatively small amount which should be added to an insurance reserve fund. The trial court made an allowance, as sought by the company, for one of the claimed funds and denied others. We shall comment on the contentions of the respective parties regarding the several funds hereinafter in detail. The defendant company has appealed from the conclusions and holdings of the trial court.

The company is the operator of a freight carrying railroad in central Iowa. It was originally operated as an electrically powered interurban and furnished both passenger and freight service. It is now Diesel powered. The present company is the result of a reorganization of a prior operating one by virtue of bankruptcy proceedings. The plan of reorganization was approved in 1941 by the Interstate Commerce Commission and the United States District Court for the Southern District of Iowa. The approved plan, and subsequent mortgage, provided for Series "A" bonds in the amount of $250,000, with fixed interest charges, and Series "B" bonds in the amount of $2,260,000, with annual interest when and if earned but not to exceed 4%. No Series "A" bonds have been issued. The mortgage also provides for the creation and maintenance of certain funds.

The issues presented on this appeal developed by reason of the differences of opinions between the parties regarding the interpretation of the mortgage. In order that the questions on appeal may be more definitely understood there are quoted in the footnote the portions of the mortgage with which we are here concerned.*

---

*Article IV. "Available net income, as that term is used herein, is defined as net income transferable to credit of profit and loss as that term is used in the form of income statement in the Uniform System of Accounts for Electric Railways, issue of

The respective contentions of the several parties have been summarized in the brief of one of the parties and as a matter of aid in explaining the respective claims they are here set forth:

| | Defendant Railroad | Plaintiff Bank-Trustee | Intervenors | Trial Court Held | Resulting Amounts |
|---|---|---|---|---|---|
| Net income per Interstate Commission accounting | $267,852.99 | $267,852.99 | $267,852.99 | $267,852.99 | |
| Deduction for unearned fixed charges carried forward from 1954 | 90,596.20 | Neutral | None | 90,596.20 | 177,256.79 |
| Deduction to restore Cash Working Capital | 77,647.94 | None | None | None | |
| Deduction for the amount by which current liabilities exceed current assets | 50,000.00 | 28,165.70 | None | 28,165.70 | 149,091.09 |
| Deduction to restore insurance reserve fund | 15,000.00 | 3,000.00 | 3,000.00 | 3,000.00 | 146,091.09 |
| Deduction to establish capital expenditure fund | 100,000.00 | None | None | None | |
| Is there sufficient available net income to pay full bond interest in 1955 | No | Yes | Yes | Yes | |

1914, prescribed by the Interstate Commerce Commission, plus any amounts deducted in the determination thereof representing charges to Account 220, 'Interest on Funded Debt', for contingent interest. Available net income shall be determined for each income period; i.e., each calendar year beginning January 1, 1941, as promptly as possible

■ I. The company's report for the year 1955 discloses the net income for that year was $267,852.99. The company contended, and the trial court so held, there should be first deducted from the net income above noted the unearned fixed charges carried forward from 1954 in the amount of $90,596.20. There is apparently no controversy relative to the amount of the claimed fixed charges carried over from the previous year. The difference of opinion develops by reason of the inclusion of certain items.

The intervenors-bondholders contend the statement in the mortgage defines "fixed charges": "All provisions of this Article are subject to the provision that, if in any income period the Railway Company shall fail to earn its fixed charges, *if any there be*, such deficit will be added to the fixed charges in the next succeeding income period or periods, so that no income will thereafter be available for Series 'B' bonds until such deficit shall have been made up. [Emphasis supplied.]" The intervenors maintain "fixed charges" means only interest on a bond with a fixed and predetermined annual interest. As previously noted the defendant company has no such bonds. They contend inasmuch as there were no fixed interest bonds there were no "fixed charges" which could be carried over.

It is also contended by the intervenors-bondholders the fixed charges referred to in the report of the Interstate Commerce Commission relative to the proposed reorganization of the company in 1941 only made reference to fixed interest bearing securities. It is further contended a prior management, in its interpretation and construction of the provision relating to fixed charges did not carry forward any unearned so-called "fixed charges" in considering the possibility of the payment of Series "B" bond interest. We do not see how this latter fact could be held controlling inasmuch as the issue was not raised by any of the affected parties. In an exhibit presented to the trial court it is shown the Interstate Commerce Commission, in one of its publications, considered fixed charges as including the fol-

within the first four months after the close of such income period. All provisions of this Article are subject to the provision that, if in any income period the Railway Company shall fail to earn its fixed charges, if any there be, such deficit will be added to the fixed charges in the next succeeding income period or periods, so that no income

lowing: "* * * Rent for leased roads and equipment, interest on funded debt; interest on unfunded debt; amortization of discount on funded debt; * * *." In other exhibits relative to other railroads fixed charges are shown to include items as defined in this division.

Webster's New International Dictionary, Second Edition, defines a "fixed charge" as: "In general, a charge that cannot be escaped or shifted, or altered; specif., such a charge becoming due at stated intervals;—opposed to a floating charge. Under the head of *fixed charges,* in railroad reports, are reckoned interest on funded debt, interest on floating debt, rentals, taxes, and sinking funds."

In Oehler's Lawyers Accounting Handbook (1952) pages 228, 229, fixed charges are referred to as charges or expenses that do not vary with the volume of business, such as charges as a result of a lease and also taxes.

The intervenors contend the defendant company is not the sole user of the leased railroad line and consequently the rental charge should not be considered a "fixed charge." We do not see how this makes any difference. The defendant, under its lease was required to pay an annual rental and it must be considered a "fixed charge." This lease expense is the only item relating to fixed charges which is questioned by the intervenors-bondholders.

An exhibit certified to this court sets out a list of what appear to be short-term loans. Some of these appear to be secured by chattel mortgages. All these items, which include the lease rental charges, total the sum of $90,596.20. This sum was not earned in 1954 and was carried over. The basis for considering all these charges as "fixed charges" is that they were generally due within the year or were obligations which required certain amounts to be paid regularly at stated intervals. We conclude

will thereafter be available for Series 'B' bonds until such deficit shall have been made up. * * *

"Available net income for each income period ending December 31 shall be applied to the following purposes and in the following order:

"a. Available net income for each income period first shall be applied to restoring to the cash working capital as of the close of the income period the amount by which such working capital (exclusive of the insurance reserve fund and the capital expenditure fund) may have been reduced during the income period below $150,000, provided that in case the current liabilities exceed the current assets as of the close of the in-

they were properly included as "fixed charges" and the total of them—$90,596.20—was properly deducted from the net income.

II. The company asserts as error the failure of the court to deduct the sum of $77,647.94 from the "available net income" to bring the cash working capital up to $150,000. The company maintains the terms of the mortgage require this deduction and refers to Article IVa of the mortgage as the basis for its contention. We have heretofore set out this portion of the instrument. In the light of our later comments in this division we do not deem it necessary to explain the manner by which the sum of $77,647.94 was reached.

The trial court found the cash working capital increased from $30,586.96 at the beginning of 1955 to $87,352.06 at the end of the year. A discussion of the computation by which the last noted amount is reached by the accountants and the trial court would not benefit the courts and members of the bar. We, as an appellate court, must determine from the mortgage itself under what circumstances the "cash working capital" is to be replenished.

It will be observed the re-establishing or increasing of the "cash working capital" shall be effected when "* * * the amount by which such working capital * * * may have been reduced during the income period below $150,000. * * *." It is definitely shown the "cash working capital" was not reduced during the 1955 income period. In fact it was increased. It may have been reduced during earlier periods below $150,000 but there is no provision for restoring all the deficiency during one year. The mortgage does not contemplate such action. It is our conclusion the trial court properly ruled the deduction sought by the company was not authorized under the mortgage.

III. The company asserts the trial court committed error in not deducting from the available net income the sum of $50,000.

come period, available net income shall be applied to increasing the $150,000 cash working capital by the amount of such excess of current liabilities over current assets, but such increase shall not exceed $50,000.

"b. Any then remaining available net income for any income period shall be applied to restoring to the insurance reserve fund hereinafter described, as of the close of the income period, the amount by which the fund may have been reduced during the income period and to increasing the fund at the rate of $3000 a year until such fund reaches a maximum of $50,000.

"c. Any then remaining available net income for any income period shall be ap-

It is claimed this deduction should have been made by reason of the provision of Article IVa of the mortgage which is as follows: "a. *Available net income for each income period first shall be applied to restoring to the cash working capital* as of the close of the income period the amount by which such working capital (exclusive of the insurance reserve fund and the capital expenditure fund) may have been reduced during the income period below $150,000, provided that in case the current liabilities exceed the current assets as of the close of the income period, available net income shall be applied to increasing the $150,000 cash working capital by the amount of such excess of current liabilities over current assets, but such increase shall not exceed $50,000."

The annual report for 1955 shows current assets of $526,686.06 and current liabilities of $554,851.76 or an excess of current liabilities over current assets of $28,165.70. It will be observed from the quotation herein set forth when the liabilities exceed the assets from the available net income there shall be deducted the amount of the excess shown "but such increase shall not exceed $50,000." The amount of excess is as above set out and this was the amount authorized by the trial court to be deducted. It was correct in so holding. There is no provision for an automatic deduction of $50,000 as maintained by the company.

IV. It is the company's contention the sum of $15,000 should have been deducted from "available net income" to restore the insurance reserve fund to $50,000. The provision in the mortgage pertaining to such a fund is noted in Article IVb which we have heretofore set out.

It is shown in the report for the year ending December 31, 1955, the insurance reserve fund then stood at $35,000. The company contends the full sum of $15,000 should be deducted from the net income in order to bring the amount up to $50,000.

plied to the creation of a sinking fund for outstanding series 'A' bonds, if provision for such a fund is established.

"d. Any then remaining available net income for any income period shall be applied to the payment, within the succeeding four months of interest on the then outstanding series 'B' bonds (not including any thereof held in the sinking fund) accrued during the last preceding income period, and of any accumulated unpaid interest thereon.

"e. Any then remaining available net income for any income period shall be

However, as previously quoted, any deductions for insurance reserve purposes from the net income shall be "the amount by which the fund may have been reduced during the income period and to increasing the fund at the rate of $3000 a year until such fund reaches a maximum of $50,000." There is no showing in the record of any deduction in the insurance reserve fund during the period of 1955. Consequently the conclusion we reach from a study of the Article in question is that the fund for this particular period should be increased in the amount of only $3000. That is the amount the trial court held should be deducted from the net income and we hold this conclusion was correct. There is no provision in the mortgage for making up all of the deficit in the contemplated $50,000 insurance reserve fund in one year.

V. The defendant railway company further claims the trial court committed error in that it failed to permit a deduction of $100,000 from the available net income for the creation and maintenance of a "capital expenditure fund."

Although Article V pertains to the establishment of a "capital expenditure fund" we should keep in mind we are concerned in this appeal with the application of the "available net income." The priority and order of payment of the net income are set out and authorized in Article IV. It will be observed the first paragraph of this Article provides any deficit in the payment of prior and current fixed charges shall be first set aside from the "available net income." It is also therein stated: "Available net income for each income period ending December 31 shall be applied to the following purposes and in the following order: * * *." Then in order are set out the priorities of deduction from the net income. In subdivision "a" reference is made to

applied to the payment of the installment of the sinking fund as hereinafter provided for the series 'B' bonds.

"f. * * *.

"Article V. Capital Expenditure Fund. No interest on series 'B' bonds or dividends on stock shall be payable out of the available cash resulting from depreciation charges until there shall have been established from such cash a capital expenditure fund up to $100,000, and no interest on series 'B' bonds or dividends on stock shall be payable out of such fund or such available cash to the extent that it shall reduce such fund below $100,000.

"The capital expenditure fund shall be applied as from time to time determined by the board of directors, either to provide for or to reimburse the treasury of the Railway

the circumstances when there should be a restoring to the "cash working capital" from the "available net income" fund. We have heretofore commented upon the facts that pertain to any deduction for application to the "cash working capital."

In subdivision "b" the next authorized payment is set out. We have commented upon the amount of deduction which should be made for the "insurance reserve fund."

Subdivision "c" relates to the application of the "available net income" for the creation of a sinking fund for outstanding Series "A" bonds. Inasmuch as there have been no such bonds issued we are not concerned with any deduction for that purpose.

We then come to subdivision "d" where provision is made that "Any then remaining available net income * * * shall be applied to the payment * * * of interest on the then outstanding series 'B' bonds * * * accrued during the last preceding income period, and of any accumulated unpaid interest thereon." The situation in the present case justifies the application of the remaining available net income after the deductions authorized, to "* * * the payment * * * of interest on the then outstanding series 'B' bonds * * *."

This is what the trial court authorized and in so holding it followed the provisions of Article IV as to priority. We approve.

It will be observed there is no reference in Article IV to or authorization for any withdrawal from "available net income" for the establishment of a "capital investment fund." Nor is such authorization to be found elsewhere. Only in Article V is provision made for such a fund and it is there provided this fund can be created out of cash resulting from depreciation charges under certain circumstances. We are now concerned only with the priority of deductions from "available net income."

---

Company for all or any part of the gross charges to the investment account (as defined under the Uniform System of Accounts for Electric Railways of the Interstate Commerce Commission, issue of 1914, accounts Nos. 401, Road and Equipment. and 404, Miscellaneous Physical Property) of the Railway Company not otherwise financed or otherwise provided for with proper adjustments for use of the second-hand materials, donations, and other items not involving a cash outlay or the equivalent thereof by the Railway Company.

"Article VI. Insurance Reserve Fund. The Railway Company has established an insurance reserve fund of $25,000 as of January 1, 1943, which fund will be increased at the rate of $3000 a year until such fund reaches a maximum of $50,000, the fund to be used for the payment of claims for personal injuries, loss, and damage to person and property, and expenses in connection therewith."

. VI. We find no basis for reversal and the trial court is affirmed.—Affirmed.

All JUSTICES concur except SMITH, J., not sitting.